Copies to: Judge
AUSA – Special Proceedings
Dft.

ABDUR-RAHIM MAHDI,
    Movant,

v.

        o
        o  Criminal No. 01-396-1 *ESH*
        o  Civil No._____

UNITED STATES OF AMERICA,
    Respondent,

**FILED**

Oct 1 7 2011

Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

ooo0ooo

## MOTION TO VACATE SET ASIDE AND OR CORRECT SENTENCE PURSUANT TO 18 U.S.C., SECTION 2255

    Comes Now, Abdur-Rahim Mahdi (hereinafter "Movant"), and moves this Court pursuant to Section 2255 for relief from his conviction and sentence. In support of his instant motion, Movant offers the contents herein.

### PROCEDURAL AND FACTUAL HISTORY

    On November 8, 2001, a grand jury sitting in the United States District Court for the District of Columbia returned a 324-count indictment against Movant and 15 others. Movant was arrested on November 15, 2001 and arraigned in the U.S. District Court for the District of Columbia before the Honorable Judge Ellen Segal Huvelle, who appointed attorney Bernard S. Grimm as counsel for Movant, and subsequently, in addition, Mary Manning Petras of the District of Columbia Public Defender's Office. Movant entered a plea of not guilty to the indictment and trial commenced on April 14, 2003 before Judge Huvelle, and on July 31, 2003, Movant was convicted on 48 counts of the re-typed 49-count indictment involving possessing and or distributing narcotics, racketeering, firearms use and possession, assault, murder, perjury and obstruction of justice. On December 4, 2003, the district court (Judge Huvelle) sentenced Movant to various concurrent prison terms, including ten life sentences followed by a 7--and five 25 year consecutive terms. Movant then noted a timely appeal and was appointed appellate attorney Robert S. Becker (5505 Connecticut Avenue, N.W., Washington, D.C. 20015; telephone number: (202)364-8013, and on March 30, 2010, the United States Court of Appeals for the District of Columbia affirmed all but six of Movant's convictions (two counts of distributing a controlled substance (cocaine base) and four counts of possessing with intent to distribute (PWID) a controlled substance (cocaine, cocaine base and marijuana) and sentences, remanding for the purpose of merging those convictions and sentences with six corresponding counts of distribution and PWID within 1,000 feet of a school, and for resentencing. United States v. Mahdi, 598 F.3d 883 (D.C. Cir. 2010). Movant's petition for certiorari to the United States Supreme Court was denied on October 12, 2010. Mahdi v. United States, 2010 U.S. LEXIS 7964 (U.S., Oct. 12, 2010).
    Now comes Movant's instant Section 2255 motion, his first, as Movant has filed no other post trial motions for habeas corpus relief in this court or no other court in or outside the instant jurisdiction. None of the claims Movant now raises in his instant 2255 motion were raised on direct appeal, as either these claims/errors are newly discovered and or were outside of the trial record and the result of trial counsel and or appellate counsel's ineffective representation.

### STATEMENT OF THE CASE

    Movant was charged with operating a narcotics distribution enterprise in Northwest Washington, D.C.. After all of Movant's co-defendants entered guilty pleas (several of whom cooperated with the government and either offered trial testimony against the Movant or gave incriminating statements against him), the indictment was filed in its final (re-typed) form, naming Movant alone as the defendant, charging him with forty-nine counts involving drugs, firearms and acts of violence, including violations of the Racketeering Influence and Corrupt Organization Act (RICO), the Violent Crimes in Aid of Racketeering statute (VICAR), and 18 U.S.C., Section 924(c). Movant's trial began on April 14, 2003, before the Honorable Huvelle, and on July 31, 2003, after hearing testimony of the cooperating codefendants, the jury returned a verdict convicting Movant of 48 counts. On December 4, 2003, the Movant was sentenced various concurrent and consecutive prison terms with the significant being ten life sentences. Movant's appeal and petition for certiorari were denied, except for a limited remand by the District of Columbia Court of Appeals directing that six of Movant's counts of conviction be vacated and merged with six other corresponding counts and that he be resentenced accordingly. No other post trial action has occurred.

RECEIVED
Mail Room

OCT 1 7 2011

Angela D. Caesar, Clerk of Court
U.S. District Court, District of Columbia

Claim One: Argument and Supporting Facts.

The Movant, Abdur Mahdi, was denied his rights to effective assistance of trial counsel and to call witnesses in his behalf when his appointed trial counsel, Bernard Grimm, failed to call Jacob Vonderpool, an eyewitness to the shooting death of Curtis Hattley, in the 1300 block of Shephard Street, N.W., Washington, D.C., on November 17, 1999, and which shooting crime was one of the significant VICAR offenses Movant was charged and convicted of. In or about February of 2003, Vonderpool had contacted Grimm in advance of Movant's trial and revealed to him his presence at the shooting scene and his observation of "Radar" (Clarence Howard), who was not the Movant nor accompanied by Movant, shoot into the car in which it was alleged that Curtis Hattley was struck and killed. (See Sworn Affidavit of Jacob Vonderpool, attached hereto as Exhibit 1). As a result of his contact with Grimm, Grimm promised to meet with and further interview Vonderpool and call him as a potential witness for the defense. Id. However, Grimm failed to meet with or further interview Vonderpool and eventually abandoned Vonderpool all together as a witness for the defense and in doing so, Grimm failed to inform the Movant, the trial court or the government of the existence of Vonderpool's exonerating statements revealed to counsel.

Here, Grimm's performance was deficient within the plain meaning of Strickland v. Washington, 466 U.S. 688 (1984). Grimm's failure to further investigate and call Vonderpool, a highly exculpatory, if not exonerating, and credible witness, who's version of the shooting death of Hattley not only excluded Movant's presence and participation in the crime, but: 1) corroborated, established and perfected the Movant's otherwise imperfect defense of actual innocence and misidentification; and 2) directly contradicted the government witnesses' version of events which version included Movant's presence and direct participation in the crime as the trigger man. Clearly, Grimm committed an egregious error in abandoning Vonderpool as a defense witness which prejudiced Movant significantly because had Vonderpool been called for the defense the jury would have had the chance to hear a contrary version of events involving the shooting death of Hattley which excluded any involvement or the presence of the Movant during the shooting and perfected Movant's actual innocence and misidentification defense since not only would Vonderpool have excluded the Movant as a participant or the actual trigger man, but Vonderpool would and could have identified the true trigger man and killer. In addition, had the jury heard Vonderpool's version of events, it may very well have determined that Movant was not guilty of the VICAR murder and D.C. Code murder offenses charged against Movant and, as well as any of the other related (if not all) counts of the indictment. In other words, the jury could have decided, based on Vonderpool's exoneration of Movant for the Hattley murder, that Movant then was not guilty of the government's overall omnibus conspiracy charged in the indictment. Thus, without question, but for Grimm's error in failing to further investigate and interview Vonderpool and thereafter abandoning him completely as a defense witness or to disclose his decision to either the Movant, the trial Court or the government, there was at least a reasonable possibility of a different out come in Movant's trial. Strickland v. Washington, supra. (See additional Affidavits and or Statements of other Affiants in relation to this claim, attached hereto as Exhibit 2-(Musa Mahdi), and Exhibit 3-(Abdur Mahdi)).

Claim Two: Argument and Supporting Facts.

The Movant, Abdur Mahdi, was denied his due process rights to confront witnesses against him, a fair trial, and to counsel when several of the government's cooperating witnesses: Antoine Tabron, David and Rodney Tabron, Hooker and Lorris, who either testified at trial or participated in debriefings and attempted stings to ensnare Movant, denied or suppressed having received special privileges, promises, payments or gifts in exchange for their testimony against Movant, and when the government knowingly suppressed the fact that special privileges, promises, payments and or gifts had been awarded at the time of each cooperators testimony. The government knew (or should have known) about sexual favors and relations, unmonitored telephone calls and or the use of personal (unrestricted) cellular telephones, and possession of contraband such as cigarettes, marijuana, and or cocaine and heroin by the cooperating witnesses but did not disclosed these facts to Movant in time for effective use at trial nor at any time thereafter. See Affidavit of Antoine Tabron, attached hereto as Exhibit 4). In addition, the government used as its payment resource, the witness--voucher payment--program as gifts to the cooperating witnesses and or their family members, friends or girlfriends. It is important to note that this exact same kind of voucher use by the government was the basis for the government misconduct claims and successful appellate and collateral challenges in the "Newton Street" federal criminal case in this very same Court. Here, Antoine Tabron's (a cooperating witness who was debriefed in regards to criminal activities of the Movant) privileges and or gifts of sexual relations with civilians, and his cellular phone access, in exchange for his potential incriminating information on Movant, which were the exact same or similar privileges and or gifts extended to David Tabron, and also to Joseph Hooker and Lorris Quashie, who did testify at trial for the government against Movant, were material to their veracity and critical impeachment evidence, without such the Movant was unable to confront or call for the defense these cooperating witnesses and challenge their credibility, truthfulness, and impeach them with their testimony and statements--for pay and their continued criminal conduct with the contraband and illicit sexual activity while incarcerated and covering it up. This was a clear violation of the Movant's trial rights in view of Brady v. Maryland, 373 U.S. 83 (1963) and Giglio v. United States, 405 U.S. 150 (1972). The Movant only discovered this evidence in or about July of 2011, from Antoine Tabron, the first direct contact he has had with Tabron since the start of the criminal prosecution and proceedings (between November of 2001 and February of 2001) in the instant case.

In the context of Brady and Giglio, the Movant was deprived of a fair trial and harmed by the violation since there is a

reasonable probability that the government and its cooperating witness' suppression affected the outcome of the case, United States v. Bagley, 473 U.S. 667, 682 (1985); that is, the suppressed evidence could reasonably be taken to put the whole case in such a different light as to undermine the verdict. Kyles v. Whitley, 514 U.S. 435 (1995). To be sure, David Tabron, Hooker and Quashie were the government's star cooperating witnesses to actually testify to having either seen Movant shoot and kill Curtis Hattley, or commit other violent acts and possess and distribute narcotics. Thus, certainly the evidence that these witnesses and other cooperators were allowed unauthorized sexual relations, cellular and other unmonitored telephone usage, and cigarettes and other narcotic contraband while incarcerated, and their deliberate silence to cover it up, was impeaching and could have affected the jury's assessment and believability of these cooperating witnesses thus putting their testimony and the government's case against Movant in a whole different light as to undermine the government's case and, undeniably so, in view of the newly discovered evidence of Jacob Vonderpool's eyewitness observation and version of the shooting death of Curtis Hattley (as presented above in Claim One), which version does not only exclude the Movant's presence and participation in the crime, but also identifies the true perpetrator(s). Accordingly, there is a reasonable probability that, had the evidence of the government's privileges, promises, and payments to its cooperating witnesses been disclosed to the defense and jury, the result of the trial would have been different. U.S. v. Bagley, supra, at 682; Kyles v.Whitley, supra, at 435. And as noted by the U.S. Supreme Court, the less stringent "reasonable probability" (i.e., as opposed to proving that an acquittal would have resulted) standard of review is applicable here because when newly discovered evidence is based on evidence that should have been but was not disclosed pursuant to the Brady doctrine, the defendant's conviction(s) must be reversed if "there is a reasonable probability that had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." U.S. v. Bagley, supra, at 682.

Claim Three: Argument and Supporting Facts.

The Movant's, Abdur-Rahim Mahdi, due process rights to equal protection under the law and against double jeopardy were infringed when the trial court entered a conviction and sentence for the lesser included 21 U.S.C., Section 846 narcotics conspiracy offense as well as the substantive RICO and VICAR conspiracy offenses. The Movant recognizes that this claim was addressed indirectly in his direct appeal by his appellate attorney Robert S. Becker, but in the slightly different nature of multiplicitous and duplicitous Indictment-Clause violations. However, as a matter of law, a lower court does not have to follow, in a later proceeding, the decision of an appellate court where that prior decision was clearly erroneous and would work a manifest injustice. See united States v. Armony, 166 F.3d 655, 661 (4th Cir. 1999)(citing Sejman v. Warner-Lambert Co., 845 F.2d 66, 69 (4th Cir. 1988)). Here, the Movant's conviction and sentence for the predicate narcotics conspiracy of the RICO and VICAR conspiracy offenses is patently double jeopardy and the District of Columbia Court of Appeals holding that "although the drug conspiracy is a lesser included offense of the RICO conspiracy, cumulative punishments are authorized"...is palpably erroneous. Cf. United States v. Marshall, 332 F.3d 254 (4th Cir. 2003)("A defendant convicted under 21 U.S.C., Section 848 (CCE) cannot, in addition be convicted for any predicate conspiracy charges proved as an element of a Section 848 offense.") (citing United States v. Wilson, 135 F.3d 291, 303 (4th Cir. 1998), and Rutledge v. United States, 517 U.S. 292, 134 L.Ed.2d 419, 116 S.Ct. 1241 (1996)). And the prejudice is present since Movant may suffer future collateral recidivism consequences as a result of the additional narcotics conviction. As well, as a result of the additional narcotics conviction, Movant has to submit to constant urinalysis testing and mandatory drug and substance abuse classes, without which the Movant is barred from all special activities and special privileges allowed other BOP prisoners that have not suffered multiple narcotics convictions. In fact, the Movant is actually innocent of having been convicted of multiple, different, separate and unrelated firearm conduct.

In addition, Movant's cumulative (mandatory consecutive sentences for the firearm violations charged in counts 27-32) sentences for the 18 U.S.C., Section 924(c) convictions was also error under the same equal protection double jeopardy arguments as made above since the firearm conduct charged was part and parcel of the overall sprawling and omnibus conspiracy the government charged in the indictment. In other words, because all of the firearm conduct alleged in the indictment occurred in the course of the substantive RICO, VICAR and narcotics conspiracy, and was related and part of the same ongoing conspiracy, all of the firearm convictions and sentences should have merged into the first firearm offense of conviction charged in count 27, lest the Movant suffer cumulative punishment for the same, ongoing, and related conspiratorial firearm conduct. In otherwords, Movant's 924(c) conduct of conviction was not seperate in relation to the substantive offenses charged in the instant federal prosecution nor was Movant convicted of a 924(c) offense(s), thereafter released from prison, and then committed and was convicted of another 924(c) offense.

Also, all of the District of Columbia Code offenses charged in the indictment, whether predicate acts of the RICO and VICAR conspiracies or standing alone, are violative of the Assimilation Act (18 U.S.C., Section 13) because the federal criminal code has as chargeable offenses: murder under all common law circumstances, cocaine, cocaine base, marijuana and heroin

narcotics substantive and conspiracy violations, as well as firearm violations under all common law circumstances. Inarguably the District of Columbia is separate from the jurisdiction of the federal government and has it's own criminal code and policing powers. Thus, the federal government violated the assimilation statute when it charged Movant in its federal indictment with the D.C. Code murder, narcotics, and firearm offenses while having the same and/or similar offenses listed in its federal criminal code. Regardless of whether the government was ingenuous enough to charge the D.C. Code offenses under the RICO and VICAR statute, it would still amount to nothing more than a disingenuous back door assimilation of D.C. Code (state) offenses for which the federal government prescribes in its own code of criminal code. As such, the Movant's indictment was jurisdictionally-legally defective and the district court tried and convicted Movant on said indictment without D.C. jurisdiction an authority to do so pursuant to proper application of Section 13's statutory provisions.

## CONCLUSION

Wherefore, Movant prays that for the above stated reasons, his convictions are vacated and a new trial ordered, and or that his convictions and sentences for the murder of Curtis Hattley be vacated, and or the firearm conduct charged in Counts 27-32 be vacated and merged into one single firearm conviction or non-aggravated sentence, and or each District of Columbia Code offense charged( and its resulting sentence) in the federal indictment be vacated.

The Movant notes that the Affidavits of Antoine Tabron, Musa Mahdi, and Jacob Vonderpool are not attached to the instant motion. The Movant is in the process of obtaining the notarized documents and had still not received them at the time of the filing of the instant motion, but could not delay the filing of the instant motion any longer as not to offend the AEDPA (Anti Effective Death Penalty Act) time period mandate. However, the Affiants have assured Movant that their Affidavits are forth coming and they purport to state exactly the same as alleged by Movant herein in the instant motion. Accordingly, Movant asks that the Court allow the supplemental filing of the forth coming Affidavits upon their receipt. As well, the Movant would then move the Court for an evidentiary hearing to further develop the facts of his claims and for proper resolution of any issues and disputes presented by the Affidavits. See e.g., Frazier v. United States, 18 F.3d 778, 784 (9th Cir. 1994)("Because all of the factual allegations were outside the record, this claim on its face should have signaled the need for an evidentiary hearing."); Blackledge v. Allison, 431 U.S. 63, 82 n.25, 97 S.Ct. 1621, 52 L.Ed.2d 136 (1977)("when the issue is one of credibility, resolution on the basis of affidavits can rarely be conclusive"...).

I, Abdur-Rahim Mahdi, hereby swears under penalty of perjury under both the federal and district of Columbia criminal codes that all statements and information presented herein is the absolute truth to the best of my knowledge and understanding. This 11th day of October, 2011.

Respectfully submitted,

*Abdur-Rahim Mahdi*
Abdur-Rahim Mahdi
Reg. No. 24541-016
USP-Canaan
P.O. BOX 300
Waymart, PA 18472

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY, that a true and correct copy of the foregoing Motion to Vacate, Set Aside And Or To Correct Sentence, pursuant to 28 U.S.C., Section 2255, was served on the United States Attorney's Office for the District of Columbia, at 555 Fourth street, N.W., Washington, D.C. 20001, via first-class mail (postage prepaid), this 11th day of October, 2011.

October 12, 2011 *Abdur-Rahim Mahdi*
Abdur-Rahim Mahdi
Reg. No. 24541-016
USP-Canaan
P.O. BOX 300
Waymart, PA 18472

# Statement

October 7, 2011

    I am Abdur-Rahim Mahdi and I was appointed by the court Attorney Bernard S. Grimm to represent me in my federal criminal case: Docket No. 01-396-1. Mr. Grimm did represent me through trial until conviction on July 31, 2003.

    At no time prior to, during or after my trial did Mr. Grimm inform me that he had any contact with Mr. Jacob Vonderpool and that Mr. Vonderpool had revealed his observation of the shooting death of Curtis Hattley on November 17, 1999 for which I, Abdur-Rahim Mahdi had been charged for, and that I, Abdur-Rahim Mahdi was not involved nor present during the shooting as charged by the government.

    I was first told of Mr. Vonderpools observations of the events of the shooting and who the trigger man was, Radar, AKA Clerance Howard, by Mr. Vonderpool via e-mail in or about December 2010 and that this fact was previously revealed to Mr. Grimm in or about Febuary 2003. I, Abdur-Rahim Mahdi did not shoot and thus kill Curtis Hattley on November 17, 1999.

    In or about July 2011 I, Abdur-Rahim Mahdi learned for the first time from Antoine Tabron that he had received privileges such as sexual relations and an unmonitored cell phone while incarcerated during the periods of my federal prosecution in exchange for solicited attempts to obtain incriminating information on me for Assistant United States Attorney Michael D. Brittin and that other co-operating co-defendants charged in my federal case, received these same or similar privileges during the same time periods.

    In or about Febuary 2011 I was told for the first time from Musa Mahdi that he was present and observed "Radar" AKA Clerence Howard shoot into a blue small car on Shepherd Street on the evening of November 17, 1999 which killed Curtis Hattley who was said to be in the car.

    I, Abdur-Rahim Mahdi, swear under penalty of perjury that everything I state herein is true.

*Abdur-Rahim Mahdi*
Abdur-Rahim Mahdi #24541-016
U.S.P. Canaan