**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

————————————————————————— )
                                                                    )
**UNITED STATES**                                 )
                                                                    )
        **v.**                                                   )        **Criminal No. 01-396-01 (ESH)**
                                                                    )
**ABDUR MAHDI,**                                )
                                                                    )
        **Defendant.**                                    )
————————————————————————— )

## <u>MEMORANDUM OPINION</u>

Before the Court is Abdur Mahdi's motion to vacate, set aside, or correct his criminal

conviction and sentence pursuant to 28 U.S.C. § 2255.  (Mahdi Mot. to Vacate [ECF No. 856].)

The gravamen of the motion pertains to his conviction for the November 17, 1999 murder of

Curtis Hattley, which Mahdi now claims was committed by a former associate named Clarence

"Radar" Howard.  For the reasons set forth herein, the motion is denied as to all claims,

including three claims raised for the first time in Mahdi's post-hearing briefs.  Furthermore,

because Mahdi has failed to make a substantial showing of the denial of a constitutional right,

*see* 28 U.S.C. § 2253(c)(2), no certificate of appealability shall be issued.

## BACKGROUND

Beginning in April 2003, Abdur Mahdi was tried on forty-nine D.C. and federal counts,

including racketeering, narcotics distribution, perjury, obstruction of justice, assault with a

dangerous weapon, and first degree murder.  (*See* Retyped Indictment, July 14, 2003 [ECF No.

444].)  On July 31, 2003, the jury found him guilty on forty-eight of those counts.  (*See*

Judgment of Conviction, Dec. 22, 2003 [ECF No. 580].)  On appeal, Mahdi argued that (1) his

indictment charged the same offense in more than one count; (2) the government failed to give

requisite notice before introducing evidence of uncharged conduct; (3) various evidentiary

rulings prevented him from mounting an effective defense; (4) his VICAR conviction violated

the Commerce Clause; and (5) resentencing was necessary in order to merge certain D.C. counts

into their corresponding federal counts.  *See generally United States v. Mahdi*, 598 F.3d 883

(D.C. Cir. 2010).  The Court rejected all but the last argument, as the parties agreed that merger

was appropriate on six narcotics possession and possession with intent to distribute counts.  *See*

*id.* at 898.  As such, Mahdi presently stands convicted of forty-two counts: twenty-four federal

counts[1] and eighteen counts under D.C. law.[2]  For these offenses, Mahdi was sentenced to

multiple concurrent life sentences, followed by one seven–year and five twenty-five-year

consecutive sentences for the six Federal Firearm Convictions.  (Judgment of Conviction, Dec.

22, 2003.)

　　　　Following the Supreme Court's denial of his petition for certiorari, *see Mahdi v. United*

---

[1] Mahdi was convicted on one count of conspiracy to distribute and possess with intent to
distribute cocaine, cocaine base and marijuana in violation of 21 U.S.C. § 846 ("Narcotics
Conspiracy Conviction"); one count of conspiracy to participate in a racketeer influenced corrupt
organization in violation of 18 U.S.C. § 1962(d)  ("RICO Conspiracy Conviction"); ten counts of
violent crimes in aid of racketeering activity in violation of 18 U.S.C. § 1959(a) ("VICAR
Convictions")); six counts of use of a firearm during a drug trafficking crime or crime of
violence in violation of 18 U.S.C. § 924(c)(1)(A)(ii) & (C)(i) ("Federal Firearm Convictions");
and six counts of unlawful distribution or possession with intent to distribute controlled
substances within 1,000 feet of a school in violation of 21 U.S.C. § 860 ("Federal Drug
Convictions").

[2] Mahdi was convicted of one count of first degree murder while armed in violation of D.C.
Code § 22-2101 ("Hattley Murder Conviction"); two counts of assault with a dangerous weapon
in violation of D.C. Code § 22-402 and six counts of assault with intent to murder while armed in
violation of D.C. Code § 22-403 ("DC Assault Convictions"); two counts of carrying a pistol
without a license and five counts of possession of a firearm during a crime of violence in
violation of D.C. Code § 22-4504 ("DC Firearm Convictions"); one count of perjury in violation
of D.C. Code § 22-2402 ("DC Perjury Conviction"); and one count of obstruction of justice in
violation of D.C. Code § 22-722(a)(6) ("DC Obstruction of Justice Conviction").

*States*, 131 S. Ct. 484 (2010), Mahdi timely filed the pending *pro se* motion.  It raised four claims for relief: (1) that Mahdi received ineffective assistance of counsel, because his trial counsel failed to call an eyewitness (Jacob Vonderpool) who would have testified that someone other than Mahdi murdered Curtis Hattley; (2) that the government provided cooperating witnesses with special treatment in prison, and that the prosecution's failure to turn over this impeachment evidence deprived him of his Fifth Amendment right to due process; (3) that the Narcotics Conspiracy Conviction and five of the six Federal Firearm Convictions violated the Fifth Amendment's Double Jeopardy Clause; and (4) that the prosecution's decision to charge him in a single indictment with both D.C. and federal offenses violated the Assimilative Crimes Act, 18 U.S.C. § 13, and deprived him of his Fifth Amendment right to equal protection.

Shortly after that filing, Mahdi submitted affidavits from three witnesses.  First, Jacob Vonderpool claimed that he had witnessed the Hattley murder while walking to a store with a friend, and that the real shooter was a man named Radar.  (Vonderpool Aff. [ECF No. 858-1] ¶¶ 1-2.)  Vonderpool also asserted that he provided this information to both Mahdi's investigator Rebecca McMahon[3] and trial counsel Bernard Grimm, and that he never heard back after Grimm promised to follow up and to likely call him as a trial witness.  (*See id.* ¶¶ 3-5.)  Finally, he claimed that he did not inform Mahdi of any of this until December 2010.  (*Id.* ¶ 5.)  An affidavit was filed by Mahdi's brother, Musa, who remains incarcerated after pleading guilty (as did three other Mahdi brothers) to various crimes arising from the Mahdi narcotics operation.  (*See Musa Mahdi Aff. [ECF No. 858-2]; Plea Agreement, Feb. 21, 2003 [ECF No. 287].)  Musa's affidavit

---

[3] Ms. McMahon was then known by her maiden name, O'Brien, but for the sake of consistency this Opinion will refer to her by her married name.

claimed that Abdur Mahdi was not present when Hattley was shot and that the real shooter was "Radar aka (Clarence)."  (*Id.*)[4]  Finally, another convicted member of the Mahdi organization, Antoine Tabron, submitted an affidavit claiming that he received special privileges from the government while in prison, in exchange for information about Mahdi.  (Tabron Aff. [ECF No. 858-3].)  Tabron did not testify at trial or at the evidentiary hearing.

Following the parties' initial briefing, the Court found that only Mahdi's claim of ineffective assistance of counsel raised sufficient factual questions to require an evidentiary hearing, and it denied the other three claims.  *See United States v. Mahdi*, 999 F. Supp. 2d 236, 250 (D.D.C. 2013).  The Court also appointed Mahdi's appellate counsel to represent him at the evidentiary hearing.  (*See* Nov. 25, 2013 Order [ECF No. 881].)

Prior to the hearing, Mahdi moved for discovery on both the ineffective assistance of counsel claim and the previously denied *Brady*/*Giglio* claim regarding witness favors.  (*See* Mot. for Discovery [ECF No. 899].)  In support of this motion, he submitted an affidavit from Joseph Hooker, a Mahdi co-defendant who testified against him at trial.  (*See* Hooker Aff. [ECF No. 904-1].)  In it, Hooker stated that the government brought food to him during debriefing sessions, asking what he would like the next day, in exchange for incriminating information about Mahdi. (*See id.* ¶¶ 4-6.)  He also claimed to have found at least two packages in his cell containing a cellphone and cigarettes.  (*Id.* ¶ 22.)  Next, Hooker recanted his trial testimony implicating Mahdi in the shooting of Curtis Hattley, claiming that the real shooter was "Clarence Howard, who [people] called Radar."  (*See id.* ¶¶ 7-8, 11, 23-24.)  Hooker stated that he only implicated

---

[4] Unlike Vonderpool, Musa Mahdi did not testify at the evidentiary hearing, nor does petitioner make any reference to Musa's affidavit in his post-hearing briefing.  The Court therefore does not afford it any consideration here.

Mahdi because that was what the government wanted, and that he chose not to implicate Radar because of his fear that Radar would kill him. (*See id.* ¶¶ 7, 14-20.) Mahdi thus argued that Hooker's affidavit buttressed Vonderpool's account of the shooting, making it more likely that Mahdi received ineffective assistance of counsel and was actually innocent of the Hattley murder. (*See* Mahdi Reply Br. [ECF No. 904] at 6-7.)

Based on the Hooker affidavit, the Court vacated its prior denial of Mahdi's *Brady*/*Giglio* claim regarding undisclosed gifts to government witnesses, at least as to witnesses relating to the Hattley murder. (*See* Nov. 24, 2014 Order [ECF No. 905] at 2 n.2.) It also found that Mahdi had demonstrated good cause to conduct discovery into his ineffective assistance of counsel claim, identifying certain categories of evidence that should be disclosed. (*See id.* at 1-2.) The government's subsequent May 19, 2015 production included two debriefing memos written by AUSA Michael Brittin, who was the original prosecutor on the case, regarding his pre-trial interviews with two witnesses to the Hattley murder—Hooker and Zakki Abdul-Rahim. (*See* May 19, 2015 Discovery Letter [ECF No. 922-1] ¶¶ (g), (m).) Mahdi did not mention these memos at the evidentiary hearing, nor did he attempt to enter them into evidence.

The evidentiary hearing took place on November 16-18, 2015. The Court heard testimony on the ineffective assistance claim from Rebecca McMahon, Jacob Vonderpool, Joseph Hooker, and Bernard Grimm. Vonderpool and Hooker testified to the same general topics addressed in their affidavits—their observation of Radar as he shot and killed Curtis Hattley, and for Vonderpool, his attempts to convey this information to Mahdi's defense team. (*See* Nov. 16, 2015 Tr. [ECF No. 939] at 51:23-155:15 (Vonderpool); *id.* at 165:13-181:13; Nov. 17, 2015 Tr. [ECF No. 940] at 11:24-116:22 (Hooker).) Grimm and McMahon testified that they could not recall whether Vonderpool offered them information about the Hattley murder, but

they seriously questioned certain aspects of Vonderpool's account and, as will be discussed, provided strong circumstantial evidence that Vonderpool did not make any such offer. (*See* Nov. 16, 2015 Tr. at 10:11-47:14 (McMahon); Nov. 18, 2015 Tr. [ECF No. 941] at 4:2-40:23 (Grimm).)

The Court also heard testimony on the *Brady/Giglio* claim from Hooker, Ken Mansfield and Paul Moloney. Mansfield, a former DOJ paralegal, testified that the government provided Hooker with food at debriefings, but nothing fancier than a fast-food sandwich or drink. (*See* Nov. 17, 2015 Tr. at 136:22-137:12.) He also testified that he never provided Hooker with a cellphone or cigarettes, nor had he seen or heard of anyone else from the government doing so. (*Id.* at 137:13-138:1.) Moloney, a DEA agent, could not remember whether he brought Hooker food during debriefings, but he did testify that he never brought Hooker a cellphone or cigarettes and had never seen anyone else from the government doing so. (*Id.* at 148:17-149:9.)

Following the testimony of Mansfield and Moloney, and given Hooker's testimony that he had no idea where the cellphones and cigarettes came from (*id.* at 73:4-19), the Court found nothing to tie the government to those gifts and thus substantiate the *Brady/Giglio* claim. (*See id.* at 152:8-154:3.) The Court therefore confirmed with Mahdi's counsel at the end of the hearing that his only remaining claim was that of ineffective assistance of counsel. (*See* Nov. 18, 2015 Tr. at 41:22-42:5.) Mahdi's counsel twice agreed on that point. (*See id.* ("THE COURT: The issue is ineffective assistance of counsel relating to the failure to call Vonderpool. MR. BECKER: That's correct, Your Honor. THE COURT: I mean that's the only issue that still remains. MR. BECKER: That's correct.").)

Following the hearing, both parties submitted proposed findings of fact and conclusions of law, and Mahdi submitted a subsequent response. (*See* Proposed Findings of Fact and Points

6

and Authorities ("Mahdi Proposed Findings") [ECF No. 942]; Government's Proposed Findings

of Fact and Conclusions of Law ("Gov't Proposed Findings") [ECF No. 944]; Response to

Government's Proposed Findings of Fact and Conclusions of Law ("Mahdi Response") [ECF

No. 945].) Despite his repeated, on-the-record acknowledgement that his only remaining claim

involved ineffective assistance of counsel, Mahdi's filings raised three entirely new claims for

relief: (1) that Hooker's recantation is newly discovered evidence that would produce an

acquittal at a new trial (*see* Mahdi Proposed Findings at 17-18); (2) that the government

knowingly elicited false testimony from Hooker in violation of the Fifth Amendment (*id.* at 14-

16); and (3) that the government violated its *Brady* obligations by failing to disclose the Hooker

and Abdul-Rahim debriefing memos written by AUSA Brittin (*id.* at 16-17).

It is unclear whether these claims are properly before the Court.  Mahdi had much of the

supporting evidence well in advance of the hearing.  (*See* Hooker Aff. (executed Nov. 17, 2014);

Discovery Letter at 1-2 (Brittin debriefing memos disclosed May 19, 2015).)  And at the hearing,

despite his protestations to the contrary, Mahdi's counsel attempted to gather evidence that was

relevant only to the new claims, unbeknownst to the Court or to government counsel.  (*See, e.g.*,

Nov. 17, 2015 Tr. at 54:5-55:4.)[5]  At no point, however, has Mahdi ever sought to amend his

motion to include the new claims.  *See United States v. Hicks*, 283 F.3d 380, 386 (D.C. Cir.

2002) (applying Federal Rule of Civil Procedure 15's "permissive approach" to the amendment

---

[5] In fact, the Court sustained numerous government objections to the relevance of questions
about Hooker's drug dealing in high school (Nov. 16, 2015 Tr. at 46:10-25; Nov. 18, 2015 Tr. at
21:6-24:19), which in hindsight were apparently aimed at supporting the newly raised
prosecutorial misconduct claim.  At the time, Mahdi's counsel misleadingly argued that the
questions were relevant to his ineffective assistance of counsel claim.  (Nov. 18, 2015 Tr. at
22:25-23:20.)

of Section 2255 motions).  Nor is it clear that he would be entitled to do so now, given the

applicable one-year statute of limitations.  *See, e.g.*, 28 U.S.C. § 2255(f); *Hicks*, 283 F.3d at 387

(amendments sought outside the limitations period are only permissible if they relate back to the

earlier, timely motion).  However, the government does not argue that Mahdi has procedurally

defaulted these claims (*see* Gov't Proposed Findings at 17-19), so the Court will proceed to

address them on the merits.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

## I.  LEGAL STANDARD

Section 2255(a) of the United States Code provides that "[a] prisoner in custody under

sentence of a [federal] court . . . claiming the right to be released upon the ground that the

sentence was imposed in violation of the Constitution or laws of the United States . . . may move

the court which imposed the sentence to vacate, set aside or correct the sentence."  28 U.S.C. §

2255(a).  Where the motion is not dismissed prior to service upon the United States Attorney, the

court will "determine the issues and make findings of fact and conclusions of law with respect

thereto."  *Id*. § 2255(b).  If the court finds that "there has been such a denial or infringement of

the constitutional rights of the prisoner as to render the judgment vulnerable to collateral attack,

the court shall vacate and set the judgment aside and shall discharge the prisoner or resentence

him or grant a new trial or correct the sentence as may appear appropriate."  *Id*.  However,

"Section 2255 is not a substitute for a direct appeal," and therefore petitioner must show "a good

deal more than would be sufficient [to warrant relief] on a direct appeal."  *See United States v.

Pollard*, 959 F.2d 1011, 1020 (D.C. Cir. 1992).  In order to protect the finality of the criminal

proceedings, the Court begins with the presumption that Mr. Mahdi "stands fairly and finally

convicted." *See United States v. Frady*, 456 U.S. 152, 164-66 (1982) (reaffirming "the well-settled principle that to obtain collateral relief a prisoner must clear a significantly higher hurdle than would exist on direct appeal").

## II.  INEFFECTIVE ASSISTANCE OF COUNSEL

1.  Clarence "Radar" Howard, a former associate of Mr. Mahdi, died of a gunshot wound in Houston, Texas on August 18, 2009.  (*See* Gov't Hearing Ex. 1.)  Sometime later, Mahdi informed Jacob Vonderpool of Radar's death.  (Nov. 16, 2015 Tr. at 109:8-25.)  On October 2, 2011, Vonderpool posted a public message on Mahdi's Facebook page reading "I GOT THAT MOVE IN THE MAKIN 4 U!!"  (Gov't Hearing Ex. 3.)  Four days later, Mahdi responded by telling Vonderpool to check his inbox and his email, implying that he did not want the substance of his response to be viewed publicly on his Facebook page.  (*See id.*)  Approximately one month after that, Vonderpool signed an affidavit identifying Radar as the murderer of Curtis Hattley. (*See* Vonderpool Aff. at 2.)

2.  The Court finds Vonderpool's explanation for the Facebook message—that he was referring to donations he had collected on Mahdi's behalf—to be unconvincing.  (*See* Nov. 16, 2015 Tr. at 147:2-11.)  Mahdi's response directing Vonderpool to his private inbox suggests that the topic was something more sensitive than mere donations.  Instead, the close temporal proximity between the Facebook messages and the Vonderpool affidavit raises a reasonable inference that Vonderpool's message *was* referring to his affidavit.

3.  Mahdi and Vonderpool have a longstanding friendship, dating back to the events that led to Mahdi's conviction.  (*See id.* at 69:13-70:17.)  Although Vonderpool testified that Mahdi was not his drug supplier (*id.* at 143:21-25), Hooker testified to the contrary at trial and during

his plea (*see* Nov. 17, 2015 Tr. at 105:21-107:17), and Vonderpool implausibly claimed not to

know his own supplier (*see* Nov. 16, 2015 Tr. at 103:12-16).  Vonderpool, whose sister was a

close friend of Mahdi's, viewed Mahdi as a "good dude, [who gave] good advice, funny," and

someone he looked up to "as a role model."  (*See id.* at 70:1-17.)  In 2013, he posted a picture of

Mahdi on his own Facebook page, along with the caption "JUST TALKED 2 MY MAN

LASTNIGHT AND HE STILL ON HIS JOKETIME SHIT LIVIN LIFE!!! HE EVEN GIVIN

ME MOTIVATION 2 DO BETTER!! #FreeBigChief #MahdiBoyz."  (Gov't Hearing Ex. 2.)[6]

Vonderpool testified at the hearing that he was very loyal and would do whatever he could to

help Mahdi, but that he was not lying in his testimony to the Court.  (*See* Nov. 16, 2015 Tr. at

110:19-111:3.)

　　　　4.    Given their long-time friendship, Vonderpool's loyalty to his "role model" Mahdi,

and his stated desire to help Mahdi, the Court finds that Vonderpool possesses a strong bias in

favor of Mahdi.

　　　　5.    Vonderpool testified that after Mahdi's conviction, he kept in contact with Mahdi "off

and on" via phone and e-mail but never visited him in prison.  (*Id*. at 86:13-87:9.)  However, he

then admitted on cross examination that he visited Mahdi thirty times in prison between 2003

and 2008, which he attempted to explain away by claiming that he had not understood the

question.  (*Id*. at 124:21-126:9.)  This discrepancy is not insignificant.  Given Vonderpool's

concession, it is clear that he covered up his close relationship with Mahdi when in fact they

communicated remotely and met in prison countless times.  It undercuts the already-implausible

notion that, despite these many communications, Vonderpool waited until December 2010 to

---

[6] "Big Chief" is Abdur Mahdi's nickname.  (*See* Nov. 16, 2015 Tr. at 142:3-5.)

10

announce that he had witnessed a murder for which he believed Mahdi had been wrongfully convicted.  Vonderpool testified that he repeatedly *tried* to tell Mahdi, but "every time [Vonderpool] would try to talk about it, [Mahdi] would shut it down."  (*See id.* at 88:23-89:10.)  The Court finds it unbelievable that Mahdi could somehow prevent Vonderpool, time and time again, from telling him that he saw Radar shoot Hattley, especially when they were communicating over e-mail.  Nor does Vonderpool offer a sufficient explanation as to what changed in December 2010, when he was finally able to convey this information to Mahdi.  (*See id.* at 86:1-5 ("Finally I mean, Abdur I guess he was maybe comfortable with speaking on the case now that everything, you know, a lot had already happened.").)  Instead, it is far more plausible that Vonderpool simply had no information about the Hattley murder to convey during any of those discussions, and that, with the death of Radar, an opportunity arose for Mahdi and/or his associates to finger a dead man for the Hattley murder.

6.  Vonderpool also asserted that he told Rebecca McMahon that Mahdi "was no bigger than the average [drug] seller."  (Vonderpool Aff. ¶ 3.)  However, he later testified at the hearing that it is "definitely accurate" that he knows nothing about Mahdi ever selling drugs.  (Nov. 16, 2015 Tr. at 104:7-12.)

7.  Vonderpool testified that Mahdi did not tell him anything to include in his affidavit.  (*Id*. at 137:19-25.)  He then acknowledged, however, that someone must have provided him with some assistance because he did not remember the date of the shooting, which he referenced in the first paragraph of his affidavit, but he did not know who this person was.  (*See id.* at 138:1-20.)

8.  In addition, Vonderpool's statements about what happened at the murder scene were often internally inconsistent.  For instance, his affidavit and hearing testimony conflicted

regarding what happened when he and his friend exited the alley.  In his affidavit, he stated that

he and his friend exited the alley and turned right on Shepherd Street, where they saw a small

bluish car driving away from them toward the corner store.  (Vonderpool Aff. ¶ 2.)  He testified

at the hearing that they instead tried to proceed straight across Shepherd but had to wait for the

car to pass.  (Nov. 16, 2015 Tr. at 115:3-20.)

      9.  Vonderpool's affidavit and hearing testimony also conflicted regarding what Radar

allegedly shouted as he shot Hattley.  In the affidavit, Radar shouted "I told you stay the fuck

away from my woman."  (Vonderpool Aff. ¶ 2.)  At the hearing, Vonderpool testified that Radar

shouted "Leave my woman or [bitch] alone."  (Nov. 16, 2015 Tr. at 66:10-14.)  Even if the Court

were to overlook that conflict as a mere discrepancy in phrasing, *both* Vonderpool versions

conflict with Hooker's hearing testimony, which stated that Radar shouted "Bitch ass nigger."

(*See id.* at 179:7.)

      10. Even Vonderpool's hearing testimony was fraught with inconsistencies.  For instance,

he contradicted himself about whether he saw or just heard Radar fire his gun.  At first, he

testified that "[w]e looked up and it was Radar shooting."  (*Id.* at 68:10-11.)  This testimony

comported with Vonderpool's prior statement that he "did not see Musa shoot nor did [he] see

Joe shoot.  It was Radar that was the only one shooting . . . ."  (Vonderpool Aff. ¶ 2.)  However,

minutes later, Vonderpool repeatedly testified that he did not see Radar shoot Hattley, and that

he had just heard shots.  (Nov. 16, 2015 Tr. at 111:4-10 ("THE COURT: Did you actually see

Radar kill Hattley?  THE WITNESS: No, I --  THE COURT: You just heard shots?  THE

WITNESS: Yeah, I just heard gunshots.  I didn't even know if the gun, where the gunshots were

going.  Like we heard them shots, we ran back through the alley.").)  This testimony caused the

Court to ask Vonderpool how he could tell that only one person fired just from hearing the shots,

and Vonderpool *again* reversed himself. (*See id.* at 111:18-21 ("That's when I seen Radar like firing the gun, we looked, and ran back into the alley.").)

11. Vonderpool's testimony regarding the shooter's location also conflicted with the weight of the trial evidence and Hooker's hearing testimony. Vonderpool testified repeatedly that Radar shot into the passing car from the driver's side. (*Id.* at 119:24-120:1, 150:8-11.) It was undisputed that Curtis Hattley was sitting in the passenger seat when he was shot (*see* June 16, 2003 (PM) Tr. at 127:2-22), that the front passenger-side window was shattered (May 29, 2003 (PM) Tr. at 65:3-9), and according to the medical examiner's testimony, the bullet wound was consistent with a passenger being shot from the passenger's side of the car (*see* June 23, 2003 (PM) Tr. at 21:17-22:18). Zakki Abdul-Rahim and Arturo Contreras both testified that the shots entered the car from the passenger side (June 16, 2003 (PM) Tr. at 130:6-22; June 23, 2003 (PM) at 67:14-68:25), as did Hooker at trial and in the hearing (*see* May 20, 2003 (AM) at 93:12-21; Nov. 16, 2015 Tr. at 180:3-10). Mahdi acknowledges this inconsistency, but he argues that Vonderpool explained it away by testifying that "so much time had passed that he was not certain." (*See* Mahdi Proposed Findings at 11-12.) This misstates the record. Mahdi's counsel unsuccessfully tried to get Vonderpool to back off this damaging "driver's side" testimony, but instead, Vonderpool affirmed his recollection *despite* the passage of time: "I mean, like I said, it was a long time ago, *but*." (*See* Nov. 16, 2015 Tr. at 149:9-17 (emphasis added).) Moreover, when the Court pressed him on this point, Vonderpool again testified without qualification that Radar was on the driver's side. (*Id.* at 149:22-150:11.)

12. Considering the glaring inconsistencies between Vonderpool's affidavit, his hearing testimony, and the evidence at trial, the Court concludes that Vonderpool did not see Radar shoot Curtis Hattley, and it is not believable that he was present at the murder scene.

13. Given this finding, it necessarily follows that Vonderpool could not have informed Mahdi's investigator or attorney about what he allegedly saw. And further confirming that point, Vonderpool's testimony about his communications with McMahon and Grimm was also highly suspect. In his affidavit, he stated that he told McMahon about the murder, and that she gave him Grimm's phone number. (Vonderpool Aff. ¶ 3.) Then months later, in February 2003, Vonderpool called Grimm and provided the same information. (*See id.* ¶ 4.) At the hearing, however, Vonderpool's version of these events changed from minute to minute. First, he testified that he contacted Grimm, who referred him to McMahon, who then contacted Vonderpool directly. (Nov. 16, 2015 Tr. at 78:18-22.) Then he testified that he talked to McMahon before talking to Grimm (*id.* at 85:16-18), followed by testimony that Mahdi referred him to Grimm, who referred him to McMahon, and "then [he] spoke to Grimm after that and then Grimm never called [him] back, but [he] talked to Rebecca first." (*Id.* at 98:13-16.) Similarly, Vonderpool could not recall for certain whether he ever told McMahon about the shooting, but "if not her, Mr. Grimm for sure." (*Id.* at 79:5-16.) Then he testified that he was unable to recall whether he told Grimm or McMahon, but reversed himself again on this point as well. (*Id.* at 79:23-80:4 ("THE COURT: So you don't recall one way or another whether you told [McMahon] anything about Hattley? THE WITNESS: To be honest, I know either Grimm or [McMahon], but I can't recall, it's been so long. THE COURT: Do you recall telling Grimm or do you recall -- THE WITNESS: Yes.") Later, he again became certain that he "definitely" told McMahon about Hattley. (*Id.* at 98:23-99:2.)

14. Neither McMahon nor Grimm could recall whether Vonderpool gave them information about the Hattley murder. However, their other testimony—which the Court finds to be credible—strongly supports the notion that Vonderpool never told either one of them that

Radar killed Hattley.

15. McMahon testified that Vonderpool had little information to offer the defense, only that he had read or heard about the case. (*Id*. at 19:8-15). She found nothing in her notes connecting Vonderpool to the Hattley murder, and she testified that if Vonderpool had offered information about Hattley, she would have documented it. (*Id*. at 22:24-23:11.) She also did not recall telling Vonderpool to call Grimm, nor would it have been her practice to do so. (*Id*. at 47:10-14.)

16. Grimm testified unequivocally that it is not his practice to speak to a witness alone, because he always needs a second observer who he can call as an impeachment witness if necessary. (*See* Nov. 18, 2015 Tr. at 5:4-25.) For the same reason, it has never been Grimm's practice to interview a witness over the phone, as Vonderpool testified. (*See id.* ("So you always want to have a witness there and never, ever, and I mean I teach investigation, do you ever interview someone on the phone, ever.").) Grimm also testified that, contrary to Vonderpool's claim, he could not "envision [a scenario] where Ms. [McMahon] would have ever given [his] phone number out to a witness. She was a top end investigator and she knew better." (*Id*. at 6:20-23.) Instead, McMahon would have contacted him and set up a joint, in-person meeting between them and the witness. (*See id.* at 6:23-7:2.) Next he testified that, even if Vonderpool *had* offered him the Hattley information over the phone, he would have created a memo to that effect. (*Id*. at 38:2-7.) No such memo has been found or produced, but a memo that *was* produced confirms Grimm's practice of memorializing phone calls with potential witnesses. (*See* Mahdi Hearing Ex. 11 (undated Grimm memo detailing a phone conversation with Zakki Abdul-Rahim).) Finally, and most crucially, Grimm testified that "[i]f Mr. Vonderpool could have testified that . . . Radar committed a homicide that Mr. Mahdi was charged with, barring

some . . . seismic credibility problems he would have been called as a witness." (Nov. 18, 2015 at 7:13-17.)  Grimm later stated this even more unequivocally: "If Mr. Vonderpool exculpated Mr. Mahdi he would have been called to testify as a witness." (*Id*. at 32:17-18.)

17. Under the standard for ineffective assistance set out in *Strickland v. Washington*, Mahdi must show that (1) his attorney made errors so serious that he was denied his Sixth Amendment right to effective counsel, and (2) these errors prejudiced him by depriving him of a fair trial.  *See* 466 U.S. 668, 687 (1984).  Because the Court has found that Vonderpool did not witness the Hattley shooting, nor did he inform Grimm or McMahon that he had, Mahdi cannot satisfy *Strickland*'s first prong.

## III.  NEWLY DISCOVERED EVIDENCE

18. At trial, three eyewitnesses identified Mahdi as the gunman who killed Curtis Hattley. (*See* May 20, 2003 (AM) Tr. at 83:6-12 (Joseph Hooker); June 16, 2003 (PM) Tr. at 129:23-130:5 (Zakki Abdul-Rahim); June 23, 2003 (PM) Tr. at 62:5-16; 67:14-24 (Arturo Contreras).) As discussed, Joseph Hooker has since recanted this testimony.  (*See* Hooker Aff. ¶¶ 23-24.) Mahdi now argues that this recantation—and Hooker's testimony that Radar was the real gunman—constitutes newly discovered evidence that would result in acquittal if presented at a new trial.  (*See* Mahdi Proposed Findings at 17-18.)

19. "Attempts are numerous by convicted defendants to overturn their criminal convictions by presenting affidavits of recanting witnesses in support of a section 2255 motion." *United States v. Kearney*, 682 F.2d 214, 219 (D.C. Cir. 1982).  As a result, "[r]ecanting affidavits and witnesses are looked upon with the utmost suspicion by the courts."  *Id*. (internal quotations omitted).  If the Court is not convinced that Hooker's prior testimony at trial was actually false,

or if other evidence conclusively establishes Mahdi's guilt in the Hattley murder, then this claim

must be rejected.  *See id.* at 220-21; *see also United States v. Henry*, 821 F. Supp. 2d 249, 260

(D.D.C. 2011) ("Even where the district court is satisfied that a witness's original testimony was

false, the proponent of post-conviction relief bears the further burden of showing that, absent the

recanted testimony, 'a new trial would *probably* produce an acquittal.'") (quoting *United States

v. Williams*, 233 F.3d 592, 593 (D.C. Cir. 2000)).  As will be discussed, this claim fails because

the Court does not believe Hooker's recantation, and because there was credible, non-biased

evidence that Mahdi was guilty of the Hattley murder, such that the recantation would probably

not produce an acquittal on retrial.

20. First, the trial testimony of Zakki Abdul-Rahim and Arturo Contreras closely tracked

Hooker's prior testimony at trial.  In addition to identifying Mahdi as the only shooter, all three

witnesses testified that: (a) the car in which Hattley was riding first turned off 14th Street onto

Shepherd headed toward 13th Street, before turning around and heading back toward 14th (*see*

May 20, 2003 (AM) Tr. at 80:9-83:2 (Hooker); June 16, 2003 (PM) Tr. at 129:25-130:5 (Abdul-

Rahim); June 23, 2003 (PM) Tr. at 58:1-9; 67:19-24 (Contreras)); (b) Mahdi fired into the car

from close range at the passenger side (*see* May 20, 2003 (AM) Tr. at 87:13-88:12; 93:12-21

(Hooker); June 16, 2003 (PM) Tr. at 130:6-25 (Abdul-Rahim); June 23, 2003 (PM) Tr. at 67:14-

68:25 (Contreras)); and (c) after the shooting, the car continued straight across 14th Street (*see*

May 20, 2003 (AM) Tr. at 89:1-4 (Hooker); June 16, 2003 (PM) Tr. at 131:15-22 (Abdul-

Rahim); June 23, 2003 (PM) Tr. at 67:19-24 (Contreras)).  Contreras's testimony also

corroborated Hooker's trial testimony that (a) prior to the shooting, Hooker pulled his car into

the alley off Shepherd Street (*see* May 20, 2003 (AM) Tr. at 82:22-83:2 (Hooker); June 23, 2003

(PM) Tr. at 65:3-8 (Contreras)); and (b) after the shooting, Hooker and Mahdi attempted to chase

17

the victim's car as it crossed 14th Street and disappeared (*see* May 20, 2003 (AM) Tr. at 89:1-25 (Hooker); June 23, 2003 (PM) Tr. at 67:24-68:1 (Contreras)).

21. This extensive corroboration of Hooker's trial testimony convinces the Court that his original account of the Hattley murder was truthful. The only other possible explanation—that all three witnesses somehow conspired to implicate Mahdi, rather than Radar—is entirely implausible. This is especially true given the intense animosity between Hooker and Abdul-Rahim, whom Hooker intended to murder. (*See* May 20, 2003 (AM) Tr. at 89:17-21.) Mahdi unpersuasively attacks Abdul-Rahim as biased (*see* Mahdi Proposed Findings at 16-17), but he conveniently ignores Contreras, who was a totally credible eyewitness with no connection to the case or its participants. (*See* June 23, 2003 (PM) Tr. at 59:9-15 (Contreras testimony identifying Mahdi and Hooker only as a "tall guy and . . . a small guy . . . from the neighborhood").) As such, he lacked any motive to lie. And, given how damaging his testimony was to this claim, it is unsurprising that Mahdi makes absolutely <u>no</u> mention of Contreras in his post-hearing briefs.

22. For these same reasons, the Court finds that the testimony of Abdul-Rahim and Contreras constitutes credible, independent evidence that establishes the guilt of Abdur Mahdi, making it highly unlikely that the recantation would produce an acquittal at retrial.

23. Furthermore, the Court finds that Hooker's identification of Radar as the Hattley shooter *eleven* years after the trial is totally unbelievable. First, it is hard to imagine how a witness could appear less credible than Hooker did at the hearing; throughout his testimony, he was evasive, hostile, and visibly uncomfortable. He claimed to remember little even after counsel tried to aid his memory (*see, e.g.*, Nov. 17, 2015 Tr. at 60:9-62:24), and he frequently revised earlier testimony, while attempting to blame counsel for his confusion (*see, e.g.*, *id.* at 57:25-58:15.) Next, Hooker has admitted under oath to perjuring himself in the past when he

falsely testified at Mahdi's trial about not carrying a pistol as a juvenile.  (*See* Add. to Mahdi

Proposed Findings [ECF No. 942-1] at 031.)  Finally, and most importantly, Hooker's

explanation for recanting is illogical.  He claimed that he only implicated Mahdi out of fear for

his safety after receiving threats from Radar and his associates.  (*See* Nov. 17, 2015 Tr. at 44:18-

21; Hooker Aff. ¶¶ 15-17.)  But in fact, Hooker admitted to implicating Radar in a host of serious

crimes, *including other murders*, during the trial and in government debriefings.  (*See, e.g.*, *id*. at

112:18-114:3.)  Moreover, his fear of Abdur Mahdi was well-documented during this period,

including in a letter to this Court stating that members of the Mahdi organization had threatened

to kill him.  (*See* Gov't Hearing Ex. 5.)  It is thus unbelievable that Hooker would have falsely

implicated Mahdi, a man that he once claimed put a loaded gun to his head and pulled the trigger

(Gov't Hearing Ex. 4A at 98:23-100:4), in order to avoid incurring Radar's wrath, even though

he was more than willing to implicate Radar in numerous other murders.  Indeed, Hooker even

implicated Radar in the Hattley murder, testifying that Radar both gave Mahdi the murder

weapon and later disposed of it for him.  (*See* May 20, 2003 (AM) Tr. at 81:24-82:3; 96:22-25.)

24. Were he telling the truth, one might expect that learning of Radar's death could have

spurred Hooker's recantation, because, according to him, he could now feel safe from reprisal.

However, Hooker testified that he did not learn of Radar's death until the hearing.  (Nov. 17,

2015 Tr. at 31:4-11.)  But even *this* testimony he recanted, admitting that he had previously

heard of Radar's death but claiming that "that doesn't mean it was true to [him]."  (*Id*. at 74:9-

16.)  Instead, he disingenuously testified that his only motivation for recanting was to clear his

conscience.  (*Id*. at 79:1-4.)

25. Mahdi argues that, even if the Court finds that Vonderpool fabricated his account of

the shooting, "[a]t the very least, the Court should credit Vonderpool's testimony as

corroborating Hooker's."  (*See* Mahdi Proposed Findings at 13-14.)  This is a strange argument.
As discussed *supra*, the Court finds Vonderpool's account of the shooting to be incredible.  It is
absolutely unclear, however, why fabricated testimony would somehow buttress similarly
unbelievable testimony by Hooker.  This is especially true because, in material respects,
Vonderpool's testimony contradicted Hooker's testimony.  (*See supra* ¶ 9 (what Radar shouted),
¶ 11 (location of shooter); *see also* Nov. 16, 2015 Tr. at 172:19-25 (Hooker remembers seeing
Vonderpool after the shooting); Vonderpool Aff. ¶ 2 (Vonderpool claims that he left the scene as
the shooting was happening).)  Nor does the Court credit Hooker's claim that he has not been in
contact with anyone involved in this case since 2003 (*see* Nov. 17, 2015 Tr. at 18:2-19:12), and
even if it were true, it would not rule out the possibility that he learned of the Radar plot through
another channel.[7]

## IV.  PROSECUTORIAL MISCONDUCT

26. Mahdi next claims that the government knowingly elicited false testimony from
Hooker in violation of his right to Due Process.  Specifically, he asserts that the prosecutors
elicited testimony from Hooker that he had never sold drugs in high school, despite having
already been told otherwise by Hooker.  (*See* Mahdi Proposed Findings at 3-5.)  Even though
Hooker's significant involvement with drugs was well-established at trial, Mahdi argues that
Hooker's false testimony about earlier drug dealing prejudiced him, because it allowed the
government to suggest that Hooker "came into the relationship as an innocent [that Mahdi]

---

[7] It should also be noted that Mahdi's counsel treads on thin ice by suggesting that AUSA Brittin
"attempt[ed] to interview Hooker in 2013."  (Mahdi Proposed Findings at 14.)  As Mahdi's
counsel is well aware, Hooker began his testimony by recanting that identification of Brittin in
response to a question from Mahdi's counsel.  (Nov. 16, 2015 Tr. at 167:18-168:11.)

corrupted." (*See id.* at 15.)  As a result, Mahdi argues that he is entitled to a new trial on every

count.  (*See id.* at 15-16.)

    27. A defendant is entitled to a new trial when (1) the government knowingly introduced

false or misleading testimony, and (2) there is a reasonable likelihood that the false testimony

could have affected the jury's verdict.  *See United States v. Straker*, 800 F.3d 570, 603 (D.C. Cir.

2015).  The Court concludes that Mahdi fails to meet his burden under both prongs—there is

insufficient evidence to conclude that the government knew about Hooker's perjury, and even if

it did know, there is no "reasonable likelihood" that the jury's verdict was affected by the

perjury.

    28. The only evidence Mahdi marshals in support of this claim is a few lines of testimony

at the hearing from Hooker (Nov. 17, 2015 Tr. at 54:20-55:4), who has now admitted to

perjuring himself on multiple occasions.  (*See* Hooker Aff. ¶ 24; Add. to Mahdi Proposed

Findings at 031.)  The entirety of the exchange went as follows:

> MAHDI'S COUNSEL: [F]rom 2001 until the trial in 2003, did the investigators
> who met with you, or the assistant U.S. Attorneys talk to you about drug dealing
> while you were at [Cardozo High School]?"
>
> A. Yes.
>
> MAHDI'S COUNSEL: Yes?
>
> A. Yes.
>
> MAHDI'S COUNSEL: Yes, okay.  And did you tell them about your drug
> dealing then?
>
> A. I told them I did.

(Nov. 17, 2015 Tr. at 54:20-55:4.)

    29. Amazingly, given that this claim was not at issue during the evidentiary hearing—and

21

that Mahdi clearly acknowledged that the only subject left for post-hearing briefing was ineffective assistance of counsel (Nov. 18, 2015 Tr. at 41:22-42:5)—Mahdi now faults the government for "produc[ing] no evidence contradicting Hooker's testimony" about the alleged prosecutorial misconduct.  (*See* Mahdi Proposed Findings at 5.)  Obviously, the government could not be expected to anticipate and rebut claims that Mahdi had not yet raised.

30. Even ignoring this attempt to sandbag opposing counsel, what Mahdi fails to recognize is that he carries the burden in a Section 2255 motion, and that this burden is "significantly higher" than it would be on direct appeal.  *See Frady*, 456 U.S. at 166.  Thus, a few lines of testimony from an admitted perjurer is plainly insufficient to meet that burden.  The Court has already found Hooker's hearing testimony to be incredible, and without any corroborating evidence, it will not credit this assertion either.

31. The Court recognizes that if the government *did* knowingly elicit false testimony from Hooker, then that finding would create "a veritable hair trigger for setting aside the conviction[s]."  *See United States v. Gale*, 314 F.3d 1, 4 (D.C. Cir. 2003).  Nevertheless, it concludes that Hooker's denial of any drug dealing in high school was immaterial to the jury's verdict given its marginal relevance and the substantial evidence introduced against Mahdi at trial.

32. As the Court stated at the evidentiary hearing (Nov. 18, 2015 Tr. at 24:5-19), Hooker was vigorously cross-examined by Mahdi's trial counsel and his involvement with drug dealing and violence was hammered home throughout the trial.  (*See, e.g.*, May 28, 2003 (AM) Tr. at 17:20-18:3.)  Hooker had already pled guilty to racketeering conspiracy, and he had admitted to many predicate acts, including the attempted murder of Zakki Abdul-Rahim, conspiracy to murder Curtis Hattley, and the sale of at least twenty-five kilograms of cocaine and twenty-five

kilograms of crack cocaine and marijuana.  (*See generally* Gov't Hearing Ex. 7.)  When he began

dealing drugs—whether in high school or after he met Mahdi—was thus an insignificant point

that could not have affected the jury's verdict.  Certainly, Mahdi is correct that Hooker's

testimony was an important part of the government's case, but it does not follow that every

minor detail of his life was material to the jury's verdict.  Indeed, when Mahdi claimed on appeal

that the Court erred in refusing to admit testimony about Hooker's high school drug dealing, the

Court of Appeals found no error and characterized that evidence as "non-exonerating testimony

of . . . little probative value."  *See Mahdi*, 598 F.3d at 895.

33. It is also important to remember that Mahdi seeks to have *all* of his forty-two

remaining convictions overturned (*see* Mahdi Proposed Findings at 15-16), and there was

substantial, independent evidence to support each of these convictions.  For instance, as

discussed, there were two other credible witnesses who implicated Mahdi in the Hattley murder.

(*See* June 16, 2003 (PM) Tr. at 129:23-130:5 (Zakki Abdul-Rahim); June 23, 2003 (PM) Tr. at

62:5-16; 64:14-24 (Arturo Contreras).)  Even if the additional knowledge that Hooker *had* begun

dealing drugs in high school somehow caused the jury to disbelieve Hooker—despite all the

other impeachment evidence already introduced against him—the remaining evidence still

weighed heavily against Mahdi.  On other counts, Mahdi makes no real effort to confront the

evidence introduced against him, other than to generally assert Hooker's importance to the

government's case.  (*See* Mahdi Proposed Findings at 14-16.)  As such, the Court will not

exhaustively rehash that evidence, but will merely refer to the Court of Appeals' finding of

"overwhelming unimpeached evidence of Mahdi's guilt provided by numerous witnesses,

wiretaps and videotapes."  *See Mahdi*, 598 F.3d at 895.

## V. BRADY VIOLATION

34. Finally, Mahdi claims that the government failed to disclose information about a dispute between Hattley, Abdul-Rahim, and a Mahdi associate named Pat Hackshaw, in violation of its obligations under *Brady v. Maryland*, 373 U.S. 83 (1963). (*See* Mahdi Proposed Findings at 16-17.)  This claim pertains to two witness debriefing memos by AUSA Brittin that Mahdi did not receive from the government until 2015 (*see* Discovery Letter at 2), in which Hooker and Abdul-Rahim recount the Hackshaw dispute. (*See* Add. to Mahdi Proposed Findings at 003-012.)  Mahdi argues that disclosure of these memos would have discredited Abdul-Rahim's testimony, and thus, the government was obligated to turn them over prior to trial. (*See* Mahdi Proposed Findings at 6-9.)[8]

35. Hooker and Abdul-Rahim provided AUSA Brittin with very similar accounts of the Hackshaw dispute.  They both stated that, days before Hattley's murder, Hackshaw shot Hattley's cousin through the hand, and Hattley and Abdul-Rahim later approached Hackshaw demanding that he pay the victim's hospital bills. (*See* Add. to Mahdi Proposed Findings at 006 (Hooker), 010-11 (Abdul-Rahim).)  This demand caused Hackshaw to angrily call Mahdi and complain that Hattley and Abdul-Rahim were shaking him down for money. (*See id.*)  The next morning, Abdul-Rahim allegedly confronted Hackshaw about Hackshaw's attempt to start a problem between Mahdi and Abdul-Rahim the previous night. (*See id.* at 011 (Abdul-Rahim

---

[8] As discussed *supra*, these memos were never entered into evidence, even though Mahdi received them six months prior to the evidentiary hearing. (*See* Discovery Letter at 1-2.)  Nor did his counsel reveal that he intended to raise a *Brady* claim until after the hearing had concluded, even though he elicited testimony relevant only to this claim during the hearing. (*See* Nov. 18, 2015 Tr. at 13:25-14:16 (probing Grimm's doubts about Abdul-Rahim's claimed motive for seeking out Mahdi on the night of the Hattley murder).)

was upset that Hackshaw "mentioned [Abdul-Rahim's] name while talking to Abdur Mahdi").)[9]

This second confrontation ended with Abdul-Rahim stating that he wanted to talk with Mahdi, and Hackshaw implying that Mahdi and Abdul-Rahim had a looming problem.  (*See id.* at 006, 010-11.)  Hooker also recounted that Mahdi was furious with Hackshaw for failing to take action against Abdul-Rahim on the spot, and that Mahdi "made it clear that he wanted to kill Zakki Abdul-Rahim."  (*See id.* at 006.)

36. At trial, Abdul-Rahim testified that he and Hattley drove to Shepherd Street on the night of the Hattley murder in order to "squash" the beef with Mahdi.  (*See* June 16, 2003 (PM) Tr. at 129:13-22.)  Mahdi thus argues that disclosure of the debriefing memos would have (1) cast doubt on Abdul-Rahim's testimony that he had a benign motive in seeking out Mahdi, and (2) provided Abdul-Rahim with a motive to falsely implicate Mahdi, rather than Radar.  (*See* Mahdi Proposed Findings at 8-9.)[10]

37. The government argues that this could not possibly be *Brady* material because it simply confirms Mahdi's motive to harm Abdul-Rahim and/or Hattley, rather than suggesting that Radar was the real shooter.  (*See* Gov't Proposed Findings at 19.)

38. Under *Brady*, the government violates Due Process when it fails to disclose evidence that is (1) favorable to the defendant and (2) material to either guilt or punishment.  *See* 373 U.S.

---

[9] Hooker places this confrontation during the initial incident the previous night, but he was getting his information secondhand from Mahdi.  (*See* Add. to Mahdi Proposed Findings at 006.)

[10] Although the first argument is intuitive, Mahdi does nothing to explain the logic behind the second—that the Hackshaw dispute somehow gave Abdul-Rahim "ample motive" to falsely identify Mahdi as Hattley's killer, instead of Radar.  (See Mahdi Proposed Findings at 8-9.)  Nor does he explain this argument in his reply brief.  Because the Hackshaw dispute has nothing to do with Radar, the Court disregards this argument as totally illogical.

at 87.  The Court agrees with the government that the debriefing memos were not favorable to the defendant, in that they only lent support to the government's trial narrative: that the ongoing beef caused Mahdi to take revenge against Abdul-Rahim by firing into his car.  This is especially true given the Hooker debriefing memo, which explicitly stated that "Abdur Mahdi made it clear that he wanted to kill Zakki Abdul-Rahim" just days before the Hattley murder.  (Add. to Mahdi Proposed Findings at 006.)  The Hooker debriefing memo also indicated that Abdul-Rahim drove past Mahdi earlier on the day of the Hattley shooting, and "Abdur Mahdi wanted to take action against Abdul-Rahim then and there, but he could not because he did not have a gun."  (*Id.*)  This is hardly exculpatory evidence that must be produced under *Brady*.

39. Indeed, the only relevant aspect of the Hackshaw dispute—the second confrontation, in which Abdul-Rahim threateningly expressed a desire to speak with Mahdi—was brought out repeatedly at trial *by the government*.  (*See* June 16, 2003 (PM) Tr. at 121:11-125:17 (Abdul-Rahim) (after second confrontation, Abdul-Rahim believed Hackshaw was "going to get something started" with Mahdi); May 20, 2003 (AM) Tr. at 76:10-79:12 (Hooker) (Abdul-Rahim said to Hackshaw "Tell [Mahdi] that I ain't finished with them," which enraged Mahdi).)  By contrast, Mahdi's trial strategy was to *downplay* the significance of his beef with Abdul-Rahim, and in particular, Abdul-Rahim's statement that he was "not finished with" Mahdi:

> MAHDI TRIAL COUNSEL: [Y]ou never used the words, and tell Abdur I'm not finished with him either, you never used that phrase, did you?
>
> ABDUL-RAHIM: Yes.
>
> MAHDI TRIAL COUNSEL: Well, when you said finished with him, you weren't trying to start a fight, right?
>
> ABDUL-RAHIM: No.
>
> MAHDI TRIAL COUNSEL: Okay.  You meant if we have a difference you

wanted to iron it out, correct?

ABDUL-RAHIM: Correct.

(June 23, 2003 (AM) Tr. at 90:21-91:5.)  Thus, not only did Mahdi and the government apparently agree that evidence of the Hackshaw dispute was unfavorable to Mahdi, but the jury itself heard that evidence.

40. That this evidence was presented at trial also confirms the lack of materiality under *Brady*'s second prong.  *See* 373 U.S. at 87.  In other words, the jury knew the relevant aspects of the Hackshaw dispute and convicted Mahdi anyway.  Thus, it either believed that Abdul-Rahim *was* seeking Mahdi to squash the beef, or it found that his dishonesty on this point was not dispositive.  Any further background that the jury could have learned about Hattley's cousin's medical bills—which the memos show Mahdi already knew about anyway (*see* Add. to Mahdi Proposed Findings at 006, 010-11)—was merely extraneous.  Mahdi's *Brady* claim thus fails to satisfy either prong.

## VI.  CERTIFICATE OF APPEALABILITY

When a district court denies a motion brought under 28 U.S.C. § 2255, it must either issue or deny a certificate of appealability.  Rule 11(a), Rules Governing Section 2255 Proceedings for the United States District Courts.  A certificate of appealability "may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  Therefore, Mahdi must demonstrate that "reasonable jurists could debate whether . . . the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'"  *Slack v. McDaniel,* 529 U.S. 473, 484 (2000) (quoting *Barefoot v. Estelle,* 463 U.S. 880, 893 n.4 (1983)).  For the

reasons stated above, Mahdi has failed to make that showing as to any of his claims, and,

accordingly, no certificate of appealability shall be issued.  If he wishes to file an appeal, he must

seek a certificate of appealability from the Court of Appeals in accordance with Federal Rule of

Appellate Procedure 22(b).  *See United States v. Smith*, 2015 WL 5882706, at *4 (D.D.C. Oct. 6,

2015).

## CONCLUSION

For the reasons stated, Mahdi's Motion to Vacate is denied as to all claims.  A separate

Order accompanies this Memorandum Opinion.


                                    _____/s/_____
                                    ELLEN SEGAL HUVELLE
                                    United States District Judge

Date:   March 24, 2016